## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**CHERYL BOLDEN, individually and on
behalf of all others similarly situated**                                        **PLAINTIFF**

**v.**                                        **Case No. 4:19-cv-00802-KGB**

**SHARON CALLAHAN**                                        **DEFENDANT**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Cheryl Bolden brought this action against defendant Sharon Callahan (Dkt. No. 1).  Ms. Bolden alleged that Ms. Callahan failed to pay her and other similarly situated commission-based cosmetologists[1] lawful minimum wages and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), *et seq.*, and the Arkansas Minimum Wage Act ("AMWA"), Arkansas Code Annotated § 11-4-201, *et seq.* (*Id.*, ¶¶ 1-2, 56).  The Court held a one-day bench trial on June 14, 2021 (Dkt. No. 28).  At the end of trial, Ms. Bolden non-suited her AMWA claim.  Post-trial, Ms. Bolden and Ms. Callahan submitted amended proposed findings of fact and conclusion of law (Dkt. Nos. 32; 33).  Ms. Bolden responded to Ms. Callahan's amended proposed findings of fact and conclusion of law (Dkt. No. 34).  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings of fact and conclusions of law. The Court determines that Ms. Bolden has not sustained her burden of proof on her FLSA claim; she is not entitled to the relief she seeks.

### I.     Findings Of Fact

1.     Ms. Bolden is a licensed cosmetologist in the State of Arkansas.

---

[1]   The Court conditionally certified a class of "all commissioned cosmetologists employed within the three years prior to the filing of the complaint." (Dkt. No. 12, at 7).  No additional plaintiffs in the conditionally certified class opted into the lawsuit.

2.      Ms. Callahan is the sole owner and operator of a hair salon, Hair Tech Studios ("the salon"), in Russellville, Arkansas.

3.      Ms. Callahan has owned the salon for 32 years.

4.      Ms. Callahan invested over $80,000.00 in the salon including $10,000.00 for a station remodel, $10,000.00 for a new air conditioning unit, and $1,000.00 for new shampoo bowls.

5.      Ms. Callahan has never made $500,000.00 or more in gross income in any year that she has owned and operated the salon.

6.      Ms. Bolden and other licensed cosmetologists provided cosmetology services at the salon.

7.      Ms. Bolden was a cosmetologist at the salon from approximately November 2017 until April 2019.

8.      Prior to working at the salon, Ms. Bolden worked as a cosmetologist at JC Penney and a chain salon, where she received regular payroll checks with taxes and other deductions taken out and a W-2 from her employer at the end of the year.

9.      During her time at the salon, Ms. Callahan considered Ms. Bolden and other cosmetologists to be independents contractors.

10.     Ms. Bolden received 1099s for 2017, 2018, and 2019 and filed taxes as an independent contractor.

11.     During the time period relevant to this lawsuit, Ms. Callahan had two types of cosmetologists providing services at the salon.  There were booth rental cosmetologists and fee-split cosmetologists.

12.     Booth rental cosmetologists paid Ms. Callahan a fee for their booth in advance every week and kept 100% of the fees they collected from the customer for services provided.

13.     Fee-split cosmetologists, like Ms. Bolden, paid Ms. Callahan a 40% commission and kept 60% of the fees collected from the customer for each service provided.

14.     Ms. Callahan guaranteed weekly pay of $200.00 for fee-split cosmetologists who chose to work 40 hours per week at the salon.  In other words, if a fee-split cosmetologist did not earn $200.00 but worked at least 40 hours at the salon during the week, Ms. Callahan would write the fee-split cosmetologist a weekly pay check for $200.00.

15.     Fee-split cosmetologists collected their own money, kept their own tips, and paid for their own tools, equipment, and maintenance and repair of those tools.

16.     The 40% commission collected by Ms. Callahan was for rent of the infrastructure and to pay for products used by Ms. Bolden and other fee-split cosmetologists that were incidental to performing the job of a cosmetologist such as access to the electronic scheduling calendar Vagaro, utilities, towels, hair spray, gels, mousse, and chemicals.

17.     The fee-split arrangement appeals to new cosmetologists who do not have an established book of business.

18.     Ms. Bolden took credit card payments at the salon which were processed on an internet-based platform.

19.     Ms. Bolden ordered supplies from State Beauty Supply or Cosmo Prof on occasion using the internet, but most of the products were either delivered from State Beauty Supply in Russellville, Arkansas, or Cosmo Prof in Conway, Arkansas, or were purchased within the State of Arkansas.

20.     The products purchased were used on or sold to customers of the salon in the State of Arkansas.

21.     Ms. Bolden used Vagaro, an internet-based calendar application for cell phones, tablets, and computers to help track appointments with clients.

22.     Ms. Bolden had her own appointment calendar in Vagaro and utilized it for booking and communicating with customers.

23.     Ms. Bolden had keys to the salon and could work any hours that she wanted to work, including nights.  Ms. Bolden could take off work, take breaks, and take lunches when she wanted.

24.     Ms. Callahan did not exercise control over how Ms. Bolden performed her cosmetology services.

25.     Ms. Callahan testified that she did not set standard prices for cosmetology services. The salon had a "Hair Menu" that outlined the base prices that fee-split cosmetologists came up with for basic services, but fee-splitting cosmetologists were each allowed to charge different prices as the job required if they wanted to do so.

26.     Ms. Bolden's weekly pay depended on the number of customers that she serviced.

27.     Ms. Callahan testified that Ms. Bolden was free to leave the salon and work somewhere else at any time or to work at more than one salon at a time.

28.     Fee-split cosmetologists were free to take their customer lists when they left the salon.

29.     Ms. Bolden had to complete 1500 hours at a state sponsored school and a written exam to receive her cosmetology license.

30.     Arkansas licensed cosmetologists are required to comply with the rules and regulations of the Arkansas State Board of Cosmetologists, including the cleanliness of the facility and the equipment used by cosmetologists.

31.     Ms. Bolden supplied all of the customary tools and equipment needed and used by cosmetologists to perform services for her customers including scissors, shears, electric trimmers, combs, brushes, hairdryers, and other tools.

32.     Trilla Turner and Kristen Beehrle, who worked at the salon while Ms. Bolden was there, testified that Ms. Callahan hired a cleaning person that cleaned on Sundays or Mondays while the salon was closed.

33.     Ms. Beehrle, who was a fee-split and then a booth rent cosmetologist at the salon while Ms. Bolden was there, testified that she did not remember seeing notes regarding cleaning on Ms. Bolden's hand-written calendar and that she did not remember seeing Ms. Bolden doing the types of cleaning noted in her hand-written calendar (Plaintiff's Exhibit 1).

34.     Ms. Beehrle also testified that Ms. Bolden was hardly in the salon, took many smoke breaks, took lots of phone calls, played games on her phone, sat around, did not want to take walk-in clients, took a lunch break every day, and frequently took personal time off.  Ms. Beehrle testified that she did not observe Ms. Bolden routinely working 40 hours or more per week while she was working at the salon.

35.     Ms. Beehrle testified that everyone by State rules and regulations was responsible for cleaning their own station and that everyone at the salon had to regularly wash and fold towels.

36.     Ms. Turner, who was a booth rent cosmetologist at the salon when Ms. Bolden worked there, testified that Ms. Bolden frequently took smoke breaks and took more phone calls than other fee-split cosmetologists.

37.     Ms. Turner testified that everyone is supposed to clean and help with towels and that the salon is one of the cleanest at which she has worked.

38.     Ms. Turner testified that there was no fee-split cosmetologist that she saw who cleaned more than any other fee-split cosmetologist.

39.     Ms. Bolden's testimony was impeached with evidence of a prior felony conviction for aggravated assault upon a correctional facility officer and a misdemeanor conviction for filing a false police report (*See* Defendant's Exhibits 2 and 3).

40.     Having observed the demeanor of all witnesses who testified in this matter, the Court does not find Ms. Bolden's handwritten calendar to be credible testimony regarding the amount of cleaning that Ms. Bolden performed at the salon or the total hours that she worked in any given week (*See* Plaintiff's Exhibit 2).

## II.     Conclusions Of Law

### A.     Application Of The FLSA

The FLSA statute broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  The Supreme Court noted that the FLSA defines the employment relationship "expansively" and with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Accordingly, the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Id.*  Also consistent with the FLSA's remedial purpose, the Supreme Court has stated that the FLSA should be construed "liberally to apply to the furthest reaches consistent with congressional direction."  *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)).  As a result, courts determining employer status

look to the economic realities of the circumstances rather than technical common law concepts of agency. *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961).

The FLSA mandates that every employer pay each of his or her employees a minimum wage and overtime compensation for any workweek that the employees are: (1) "engaged in commerce or in the production of goods for commerce" (individual coverage) or (2) "employed in an enterprise engaged in commerce or in the production of goods for commerce" (enterprise coverage). 29 U.S.C. §§ 206(a), 207(a). To demonstrate individual coverage under the FLSA, a plaintiff must prove that, at times relevant to his claim, he was engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(2)(C). Likewise, in order to demonstrate enterprise coverage under the FLSA, a plaintiff must prove that his employer was an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 203(s)(1). Either individual or enterprise coverage is enough to invoke FLSA protection.

### 1.      FLSA:  Individual Coverage

The FLSA provides "coverage for 'employees who [are] themselves engaged in commerce or in the production of goods for commerce.'" *Reich v. Stewart*, 121 F.3d 400, 405 (8th Cir. 1997) (quoting *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 517 (1973)). "For individual coverage, '[t]he burden of proof lies on employees to establish that they were engaged in interstate commerce, or in the production of goods, and that such production was for interstate commerce.'" *Miller v. Centerfold Entm't Club, Inc.*, Case No. 6:14-cv-6074, 2017 WL 3425887, at *3 (W.D. Ark. Aug. 9, 2017) (quoting *Joseph v. Nichell's Caribbean Cuisine, Inc.*, 862 F. Supp. 2d 1309, 1312 (S.D. Fla. 2012)). To meet her burden Ms. Bolden must show that she was "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(2)(C). The test "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether

they are actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943).  For an employee to be "engaged in commerce" under the FLSA, the employee must directly participate "in the actual movement of persons or things in interstate commerce" by "(i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006) (citing 29 C.F.R. § 776.23(d)(2); 29 C.F.R. § 776.24); *see also* 29 C.F.R. § 776.10(b); *Schmidt v. Peoples Tel. Union of Maryville, Mo.*, 138 F.2d 13, 15 (8th Cir. 1943).

The Department of Labor's *Field Operations Handbook* states that individual coverage may exist for employees of even primarily local retail and service establishments under certain circumstances.[2]  Examples of covered activities include:

(1) ordering of supplies and goods by mail, telephone, and fax and receipt of goods ordered from out-of-state suppliers,

(2) processing of credit card purchases such as preparation of credit card slip initiating a transaction with an out-of-state credit card company or transmission of a credit card check to an out-of-state clearinghouse, and

(3) transmission of information regarding a customer's personal check to an out-of-state clearinghouse for approval.

*See* United States Department of Labor, *Field Operations Handbook*, Chapter 11, 11r01, March 28, 2022, https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-11#B11a01.

---

[2] The Eighth Circuit has determined that although "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference, . . . [they] are entitled to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), based on their persuasiveness." *Baouch v. Werner Enterprises, Inc.*, 908 F.3d 1107, 1117 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 122 (2019) (internal citations omitted).

A number of courts have held that the mere processing of credit card payments is not enough for a plaintiff to establish individual coverage. *See e.g., Thorne v. All Restoration Servs., Inc.,* 448 F.3d 1264, 1266–67 (11th Cir. 2006); *Joseph v. Nichell's Caribbean Cuisine, Inc.*, 862 F. Supp. 2d 1309, 1313 (S.D. Fla. 2012); *Ecoquij-Tzep v. Hawaiian Grill*, Case No. 3:16-cv-625-BN, 2016 WL 8674569, at *5 (N.D. Tex. Dec. 16, 2016); *Mayo v. Jean Nicole Hair Salons, Inc.*, Case No. 2:15-cv-115-FtM-38MRM, 2015 WL 4751202, at *3 (M.D. Fla. Aug. 11, 2015).

In *Mayo*, the Court considered whether a cosmetologist was engaged in commerce for the purpose of invoking individual coverage of the FLSA. The cosmetologist asserted that her duties included "using a telephone to communicate and schedule appointments with customers outside [the state] and us[ing] credit cards to finalize sales." *Id*. at *2. The court, however, concluded that neither her telephone use nor her processing of credit cards was enough to establish that she was working in or regularly using the instrumentalities of interstate commerce to establish individual coverage. *Id.* at *3. With regard to her assertion that credit card sales and the sale of hair products established that she was engaged in commerce, the court concluded that "merely using a customer's credit card to ring up the sale does not constitute interstate commerce[,]" and that "even if [the hairstylist] processed credit card payments from out of state customers, she performed hair salon services in [the state] and any products sold were sold to [in-state] customers." *Id*. Additionally, the court noted that although the hair products moved through the stream of commerce, the stream of commerce ended when the services and goods were provided to customers in the hair salon. *Id.* Thus, the court concluded that the cosmetologist was not entitled to individual coverage under the FLSA. *Id*.

The record evidence is that Ms. Bolden also used an internet-based calendaring application, Vagaro, nearly every day to book client appointments and communicate with clients, one of a

cosmetologist's primary duties.  Ms. Bolden used this internet, cloud-based appointment program provided by Ms. Callahan on an almost daily basis to book appointments and communicate with customers.  The Court acknowledges that, in *Miller v. Centerfold Entertainment Club, Inc*, the court concluded that dancers who regularly used the internet to stream songs to perform their dances was sufficient to establish individual coverage.  *Miller*, 2017 WL 3425887, at *3.

The record evidence is that Ms. Bolden regularly processed credit card payments using the internet and that a majority of the salon's business is conducted through credit card transactions with Arkansas customers.  Ms. Bolden did not regularly order products from out-of-state suppliers at the salon, but she did assist Ms. Callahan with some online ordering.  The products were mostly delivered from State Beauty Supply in Russellville, Arkansas, and Cosmo Prof in Conway, Arkansas, and were used on or sold to customers at the salon in Arkansas.

Based on all of the evidence produced at trial, the Court concludes that Ms. Bolden's activities are closely enough related to interstate commerce to establish individual coverage under the FLSA, but this does not end the Court's analysis.  The Court also considers Ms. Bolden's status under the FLSA as explained in this Order.

### 2.    FLSA:  Enterprise Coverage

A defendant is subject to FLSA enterprise coverage if it is shown that it:  (1) "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and (2) has an "annual gross volume of sales made or business done [] not less than $500,000."  29 U.S.C. § 203(s)(1)(A).  There was no evidence presented at trial that Ms. Callahan had annual gross volume of sales of $500,000.00.  The Court concludes that Ms. Callahan is not subject to the FLSA's enterprise coverage.

### B.    Ms. Bolden's Status Under The FLSA

Employer is defined under the FLSA as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The FLSA defines an "employee" as "any individual employed by an employer" and defines "employ" as "to suffer or permit to work."  29 U.S.C. §§ 203(e)(1), 203(g).  "The test for employment under the [FLSA] is one of economic reality."  *Karlson v. Action Process Servicer & Private Investigations, LLC*, 860 F.3d 1089 (8th Cir. 2017) (quoting *Tony & Susan Alamo Found.*, 471 U.S. at 301) (internal quotation marks, alterations, and citations omitted).  "In determining whether an entity functions as an individual's employer, courts generally look to the economic reality of the arrangement." *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (citing *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961) ("[T]he 'economic reality' rather than 'technical concepts' is to be the test of employment")).

Courts typically analyze the following six factors:  (1) the degree of control exercised by the alleged employer; (2) the individual's investment in the business; (3) the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative in performing the job; (5) the permanency of the relationship; and (6) the extent to which the work is an integral part of the alleged employer's business.  *See, e.g.*, *Whitworth v. French Quarter Partners, LLC*, Case No. 6:13-cv-6003, 2014 WL 12594213, at *3 (W.D. Ark. June 30, 2014); *see also Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997).

### 1.    Degree Of Control

The degree of control exercised factor evaluates "whether a worker's 'freedom to work when [he or she] wants and for whomever [he or she] wants reflects economic independence, or whether the freedoms merely mask[s] the economic reality of dependence.'"  *Carter v. Primary Home Care of Hot Springs, Inc.*, Case No. 6:14-cv-6092, 2015 WL 11120563, at *3 (W.D. Ark.

May 14, 2015) (quoting *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995)). In evaluating the degree of control, it is necessary to distinguish discretion and flexibility from independence.  If an individual has some discretion and flexibility in how they perform their job, but the employer ultimately retains most of the control in how a job is performed, then this factor weighs in favor of finding employee status under the FLSA. *See Whitworth*, 2014 WL 12594213, at \*4-\*5 (the degree of control factor weighed in favor of finding dancers were employees because, even though they were given some discretion and flexibility in how they performed their work, their work was ultimately controlled by the club); *Carter*, 2015 WL 11120563, at \*3 (concluding that factor weighed towards finding caregivers employees because even though the caregivers had discretion with how they performed their duties and in creating their schedules, the employer exercised significant control); *but see Roslov v. DirecTV Inc.*, 218 F. Supp. 3d 965, 976 (E.D. Ark. 2016) (concluding that factor weighed in favor of finding that a satellite technician was an independent contractor because he was able to set his own schedule and could determine the amount of work he did).

Ms. Bolden had a key to the salon and was free to set her own hours at the salon.  Ms. Callahan encourage Ms. Bolden and other fee-split cosmetologists to work from 9 a.m. to 6 p.m. to have the opportunity to service walk-in clients, but she did not require the fee-split cosmetologists to be there during those hours.  While Ms. Callahan offered the incentive of a $200.00 paycheck if Ms. Bolden worked 40 hours per week, she did not require Ms. Bolden to do so or to "clock in" and "clock out" in order to establish that she had been at the salon 40 hours during the week in order to obtain the incentive check at the end of the week.  The record also reflects that most days, Ms. Callahan did not arrive at the salon until 2:00 p.m. and did not instruct fee spit cosmetologists about how to perform services or when to book appointments.  The record

indicates that the fee-split cosmetologists came up with a "Hair Menu" that set prices for basic services, but that individual cosmetologists were free to vary from the prices set on the menu.  Ms. Callahan testified to at least one example when she knew that Ms. Bolden had varied upward from the price for a service provided to a customer.  Finally, the record reflects that fee-split cosmetologists were free to work at other salons while working at Ms. Callahan's salon.  The degree of control factor weights in favor of finding Ms. Bolden an independent contractor and not an employee.

### 2.      Opportunity For Profit Or Loss

When evaluating an individual's opportunity for profit and loss, courts have looked at whether the individual has an ownership interest in the business and whether the individual bears the risk of economic losses.  *See Roslov*, 218 F. Supp. 3d 974, 977; *Whitworth*, 2014 WL 12594213, at *5; *Carter*, 2015 WL 11120563, at *4; *Miller*, 2017 WL 3425887, at *6.  In *Roslov*, the court concluded that a satellite television equipment technician was an independent contractor in part because he was in control of his profits and losses because "there were not agreements guaranteeing Roslov a certain income level each week," and he would bear the economic loss if he was unable to work or was not provided with orders to service. 218 F. Supp. 3d at 977.

As a cosmetologist, Ms. Bolden bore the economic risk of being unable to work or not having any clients to service.  The risk was, however, somewhat tempered by Ms. Callahan's incentive to pay her $200.00 per week if she worked for 40 hours per week at the salon.  Ms. Bolden still, however, had a risk of loss if she could or would not work at the salon for 40 hours per week.  Additionally, Ms. Bolden had an opportunity for profit by accepting walk-in clients, working additional hours at the salon beyond the typical hours of operation or at another salon, advertising her services, setting her own prices, and building her own book of business.  The

opportunities for profit and loss were made clear on the record through the testimony of Ms. Bolden, who stated that she never earned enough money as a fee-split cosmetologist, and the testimony of Ms. Beehrle, who built her business and progressed from a fee-split to a booth rent arrangement with Ms. Callahan while at the salon because of the opportunity for profit.  Based on the testimony at trial, the Court concludes that the opportunity for profit or loss factor weighs in favor of finding Ms. Bolden an independent contractor and not an employee.

### 3.    Worker's Investment In The Business

An individual that makes significant investments in the business weighs in favor of independent contractor status.  *Roslov*, 218 F. Supp. 3d at 975.  Even if an individual purchases their own tools and equipment to do their job, some courts have determined that does not automatically weigh in favor of finding independent contractor status because it is a relatively minor investment in the business compared to the investment of the employer.  *Stagl v. Vadell*, Case No. 4:11-cv-014, 2011 WL 5553484, at *4 (D. N.D. Nov. 15, 2011) (concluding after weighing all of the factors that cosmetologists were employees even though they provided their own hair dryers, flat irons, and scissors); *Karnes v. Happy Trails RV Park, LLC*, 361 F. Supp. 3d 921, 930 (W.D. Mo. 2019) (concluding that a park manager was an employee because, even though he provided his own hand tools, the park owners provided a lawn mower, trimmers, a computer golf cart, pool supplies, a cash register, and a garage to store equipment in in addition to complimentary on-site housing); *Miller*, 2017 WL 3425887, at *5 (concluding dancers to be employees of a club in part because even though they provided their own costumes, it was insignificant compared to the amount the club owner expended in operating the club).

Ms. Bolden's investments in the business are her scissors, shears, trimmers, combs, brushes, and other necessary tools to perform her services valued at around $1,000.00.  Ms.

14

Callahan, on the other hand, invested over $80,000.00 in the salon, including but not limited to, $10,000.00 for a station remodel, $10,000.00 for a new air conditioning unit, and $1,000.00 for new shampoo bowls.  The individual's investment in the business factor weighs in favor of finding Ms. Bolden an employee.

### 4.        The Skill And Initiative In Performing The Job

The skill and initiative factor looks not only at the skill required to perform the job but also considers "certain elements of business initiative, such as attempts to advance a business and expand [a] client base and goodwill through advertising, marketing, and sales methods, and choice of products or services."  2015 WL 11120563, at *4 (citing *Reich v. Circle C. Invs.*, 998 F.2d 324, 328 (5th Cir. 1993); *Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995)).  In other words, a court looks at whether the individual had a particular degree of skill required to perform the job and whether they had the initiative to elevate their status as an independent contractor. Individuals who work in trades are usually regarded as independent contractors.  *Roslov*, 218 F. Supp. 3d at 975.

Ms. Bolden was a licensed cosmetologist.  To be licensed in Arkansas, Ms. Bolden had to complete 1500 hours at a state sponsored school and a written exam.  Additionally, Ms. Bolden must maintain her cosmetology license.  Because her job requires specialized training and skill, the Court concludes that the skill and initiative factor weighs in favor of finding Ms. Bolden an independent contractor and not an employee.

### 5.        Permanency Of The Relationship

"The more permanent the relationship, the more likely the worker is to be an employee." *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 309 (4th Cir. 2006).  Courts have held that an indefinite, open-ended relationship with no specified expiration can, in some instances, favor a

finding of an employment relationship.  *See e.g. Karnes*, 361 F. Supp. 3d 921 at 932 (W.D. Mo. 2019) (finding and employment relationship where plaintiff and defendant had a six-year open ended business relationship and where there was no evidence that plaintiff had a business relationship with anyone else during that period).  Further, even employment relationships that allow for employment elsewhere may still in some circumstance favor a finding of an employment relationship.  *See e.g. Miller*, 2017 WL 3425887, at *6 (concluding that permanency factor weighed in favor of plaintiff dancers being employees because dancers worked at club between one and eight years and were required to work at club three nights per week even when they held other employment).

At trial, the testimony established that this is a transient business where it is common for cosmetologists to move frequently from salon to salon.  Ms. Callahan and Ms. Bolden did not have a written agreement.  Ms. Callahan did not consider the relationship permanent.  Ms. Bolden was free to work for other salons while working at the salon.  Ms. Bolden was free to stop working at the salon at any time.  Ms. Bolden was at the salon for 18 months when the relationship ended. The Court concludes that the permanency of the relationship factor weighs in favor of finding Ms. Bolden an independent contractor and not an employee.

### 6.    Integral Part Of The Business

The last factor the court considers is whether the work the individual does is an integral part of the alleged employer's business.  An individual's tasks are integral to the employer's business when the business cannot operate without the individual providing those services.  *See Whitworth*, 2014 WL 12594213, at *7 (finding factor weighed in favor of finding dancers to be employees because the club could not operate without their services); *Miller*, 2017 WL 3425887, at *6 (same); *Karnes*, 361 F. Supp. 3d 921 at 932 (finding factor weighed in favor park managers

16

being employees because their services were critical for park operations); *Carter*, 2015 WL 11120563, at *5 (finding factor weighed in favor of caregivers being employees because caregiving services were the main services of that business).

The salon's business is to provide cosmetology services including spa services. Ms. Bolden provided cosmetology services at the salon, and her work was an integral part of Ms. Callahan's business. The Court concludes that the integral part of the business factor weighs in favor of finding Ms. Bolden an employee and not an independent contractor.

### 7.   Conclusion

Based on the trial record and considering all of the factors set forth above, the Court determines that Ms. Bolden was not an employee of Ms. Callahan under the FLSA but was an independent contractor. The economic realities of their arrangement do not support Ms. Bolden's argument that she was not an independent contractor.

### III.   Conclusion

For the foregoing reasons, the Court finds in favor of defendant Sharon Callahan and against plaintiff Cheryl Bolden on her FLSA claim. The relief requested is denied.

It is so ordered this 31st day of March, 2022.

Kristine G. Baker
United States District Judge

17